## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JEROME S. TANNENBAUM and** | ) | |
| **DEBORAH M. TANNENBAUM,** | ) | |
| | ) | **No. 3:11-cv-01077** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Nixon** |
| **v.** | ) | **Magistrate Judge Griffin** |
| | ) | |
| **FEDERAL INSURANCE COMPANY,** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Pending before the Court is Defendant Federal Insurance Company's Motion for

Summary Judgment ("Motion"). (Doc. No. 54.) For the reasons stated below, Defendant's

Motion is **GRANTED in part**, and **DENIED in part**.

**I.    BACKGROUND**

    *A.  Factual History*[1]

Plaintiffs Doctor Jerome S. Tannenbaum and Deborah M. Tannenbaum own a 6.75 acre

residential property at 4375 Chickering Lane in Nashville, Tennessee ("the Property"), on which

sits an approximately 7,000 square foot house ("main house") and a pool house. As early as

2003, the Tannenbaums have used the Property as a rental property; however, in the time period

relevant to this case the Property was not rented, and a house-sitter was staying in the main

house.

Defendant Federal Insurance Company ("FIC") issued the Tannenbaums a "Masterpiece"

insurance policy ("Policy") effective for the period between August 1, 2009, and August 1, 2010,

that provided coverage for "**all risk** of physical loss to [the] house or other property covered

---

[1] Unless otherwise indicated, the facts in this section are undisputed and taken from Plaintiffs' Response to
Defendant's Statement of Undisputed Material Facts (Doc. No. 66) and Defendant's Response to Plaintiffs'
Statement of Additional Facts (Doc. No. 73).

under this part of [the] Masterpiece Policy, unless stated otherwise or an exclusion applies."
(Doc. No. 55-4 at 13.)  The Policy excluded coverage for any loss "contributed to, made worse
by, or [that] in any way results from" any of numerous enumerated policy exclusions.  (*Id.* at 18.)
While the Policy covered damages sustained due to wind, subject to other Policy limits and
conditions (Doc. No. 73 ¶ 3), it specifically excluded losses due to "earth movement including
. . . landslides, mud flows, and the sinking, rising or shifting of land" (Doc. No. 55-4 at 20).

On the weekend of May 1, 2010, Nashville experienced a severe weather system, and at
around 10:30 a.m. on May 2, 2010, Mrs. Tannenbaum went to inspect the Property for storm
damage.  Upon arrival, Mrs. Tannenbaum discovered that the house-sitter was not present and
the Property had sustained serious weather-related damage.  Mrs. Tannenbaum observed, among
other things, that the iron gates and front door to the main house had been "blown off" and a
large tree was jutting through the front doorway.

Mrs. Tannenbaum called FIC that afternoon to report the damage and spoke with
property claims specialist Mark Black, whom FIC assigned as the claims adjuster for the
Tannenbaums' claim.  (Doc. No. 54-6 ¶¶ 1–2.)  Mr. Black and Mrs. Tannenbaum agreed over the
phone to meet at the Property on May 3, 2010, so that Mr. Black could perform an inspection.
Mrs. Tannenbaum then returned to the Property to photograph the damage.

On the morning of May 3, 2010, prior to visiting the Property, Mr. Black spoke with Mrs.
Tannenbaum again over the phone.  The parties dispute whether, during that conversation, Mr.
Black told Mrs. Tannenbaum that he believed the damage had been caused by a landslide.  The
same afternoon, Mr. Black visited and inspected the Property and then sent a communication to
another FIC employee stating that, based on his inspection and the physical evidence, he
believed the damage was "the result of the slope giving way and causing a landslide due to the
extreme amount of rain."  (Doc. No. 58-6 at 1.)  Mr. Black recommended that FIC engage an

engineer to evaluate the property and determine the cause of damage. (*Id.*) He also cautioned that, based on his discussions with the Tannenbaums, he believed the claim would be contentious, as they believed the cause of damage was high winds uprooting and snapping trees and pushing them into the main and pool houses. (*Id.*; Doc. No. 66 ¶¶ 7, 76–77.) On May 4, 2010, Dr. Tannenbaum informed Mr. Black that he had hired geotechnical engineer J. Samuel Vance, structural engineer Rao Patri, and arborist Jeff Garn as consultants to evaluate the Property. (Doc. No. 58-9 at 1.)

On May 5, 2010, FIC reassigned the Tannenbaums' claim to executive general adjuster Steve Mortensen, who the Tannenbaums informed that their consultants had determined that wind was the cause of damage to the Property. Mr. Mortensen sent the Tannenbaums a reservation of rights letter on the same day, advising that FIC was in the process of engaging its own consultants to assist with the determination of the cause of loss and explaining that the exclusions of coverage for damage caused by surface water, ground water, fungi and mold, and earth movement might "have applicability to your claim." (Doc. No. 60-1 at 2–3.)

FIC retained geotechnical engineer Doctor David Sykora, wind engineer Doctor Bob Bailey, meteorologist Doctor William Vaughn, construction consultant J.R. Creech, and structural engineer Fred Weis to investigate the Tannenbaums' claim. Mr. Mortensen also requested to meet with the Tannenbaums' consultants, but no meeting occurred.

On May 14, 2010, Mr. Mortensen prepared his first report on the Tannenbaums' claim, categorizing the cause of loss as "Earth Movement – CAT 11" and stating that, although the Tannenbaums claimed their loss was caused by wind propelling trees into the structures on the Property, the physical evidence did not support their theory. (Doc. No. 60-13 at 1, 5.)

On May 19, 2010, Dr. Vaughn, met with the Tannenbaums and inspected the Property (*see* Doc. No. 60-20 at 1), and on May 22, 2010 he prepared a report detailing his assessment of

the weather conditions at the Property on May 1 and 2, 2010 (Doc. No. 59-1). Dr. Vaughn opined that the Property likely experienced conditions similar to those recorded by the National Weather Service at Nashville International Airport, including record rainfall and the potential for straight line or downdraft winds, with gusts reaching forty to fifty miles per hour. (*Id.* at 4–5.) Dr. Vaughn noted that whether the mudslide that occurred was triggered by the combination of rain-soaked earth and modest winds, or was independent of any wind was beyond the scope of his report. (*Id.* at 6.)

Dr. Sykora inspected the Property on May 10, and Dr. Bailey on May 13, 2010. They then issued a report assessing the cause of damage to the main house on June 17, 2010. (Doc. No. 63-1.) Based on their inspections, research, and review of Dr. Vaughn's report, they concluded damage to the Property was caused by "debris flow . . . that flowed downslope and subsequently impacted and penetrated the house." (*Id.* at 14.) They also concluded that wind was not a cause of the damage to the main house and that "[t]he trees that impacted and damaged the house were part of the debris flow and were transported by gravity down the slope towards the house." (*Id.*) Doctors Sykora and Bailey subsequently issued a report determining that the cause of damage to the pool house was the same as the cause of damage to the main house. (Doc. No. 63-2 at 13.)

On May 26, 2010, Mr. Creech and Mr. Weis of EMC Structural Engineers ("EMC") inspected the Property and met with the Tannenbaums and their structural engineer. (Doc. No. 59-6.) Based on Mr. Creech and Mr. Weis's initial and subsequent inspections, senior structural engineer Benjamin Buergler of EMC produced a report on June 23, 2010, outlining the damage observed and recommending repairs for the main and pool houses. (Doc. No. 61-2.)

On June 17, 2010, Shakira Stanford of FIC's subrogation department contacted the Tannenbaums to inform them that FIC had determined that there was no potential for

subrogation for the Tannenbaums' claim.  (Doc. No. 71-4 at 1.)  The Tannenbaums state that Ms. Stanford spoke with Mrs. Tannenbaum on June 18, 2010, at which time Ms. Stanford told Mrs. Tannenbaum that FIC's subrogation department had determined that there was no potential subrogation recovery because damage to the property was caused by trees and wind.  (Doc. Nos. 1-2 ¶ 43; 67-5 at 62; 71-4 at 6; 73 ¶ 41.)  FIC agrees that Ms. Stanford attempted to speak with the Tannenbaums on June 17, 2010, but denies that Ms. Stanford spoke with Mrs. Tannenbaum the next day.  (Doc. Nos. 5 ¶ 43; 73 ¶ 41.)

On June 23, 2010, Mr. Mortensen sent the Tannenbaums copies of Dr. Vaughn's meteorological report, the narrative portion of the cause of loss report of Doctors Sykora and Bailey, and Mr. Buergler's structural report.  On June 30, 2010, Mr. Mortensen, Mr. Creech, Mr. Weis, and Mr. Buergler conducted another inspection of the Property.  (*See* Doc. No. 61-8.)

On July 23, 2010, Mr. Mortensen sent the Tannenbaums a coverage position letter, in which FIC denied the vast majority of the Tannenbaums' claim for damage to the main and pool houses as excluded under the Policy's "earth movement" exclusion.  (Doc. No. 61-17 at 3.)  FIC also denied the Tannenbaums' claims for damage to their driveway, paved parking, retaining wall, and patio as excluded by the "surface water,"  "ground water," and/or "earth movement" exclusions to the Policy (*id.* at 3–4), and the Tannenbaums' claim for personal property damage because FIC determined the damage was caused by a non-covered loss (*id.* at 4–5).  FIC determined that mold-remediation expenses were also excluded from coverage under the "fungi and mold" exclusion in the Policy.  (*Id.* at 5.)  FIC agreed, however, that damage caused by a single tree that had fallen onto the main house was caused by wind (as the Tannenbaums' theorized) and awarded $55,918.50 for repairs associated with the fallen tree, as well as $2,500.00 for removal of two fallen trees due to wind.  (*Id.*)  Despite Mr. Mortensen's requests, the Tannenbaums did not provide Mr. Mortensen with any of their consultants' reports before he

issued the claim determination, and thus, they were not part of his determination. FIC's repair consultant, Mr. Creech, estimated the total cost to repair the main and pool houses to be $1,724,196.43 (Doc. No. 61-11 at 44), while the Tannenbaums estimate their loss at over $2,000,000.00 (Doc. No. 62-6 at 3).

After further communication with the Tannenbaums in July and August 2010, Mr. Mortensen again requested that they provide him with information bearing on FIC's coverage determination, including reports prepared by their consultants. January 24, 2011, counsel for the Tannenbaums sent Mr. Mortensen a request for reconsideration of his July 23, 2010, claim decision, along with reports by Mr. Patri and Robert T. Stickney, a geotechnical and environmental consultant. (Doc. No. 62-17.) The Tannenbaums stated that their consultants' reports conflicted with those of FIC's consultants and that, based on the findings of their experts, the primary cause of the damage to the Property was wind rather than earth movement.

On January 25, 2011, Mr. Mortensen informed the Tannenbaums that FIC would review their experts' reports to determine whether it should alter its coverage decision. However, FIC ultimately declined to amend its July 23, 2010, determination. On August 5, 2011, counsel for the Tannenbaums sent FIC a letter demanding payment on their claim under the Policy and notifying it of their intent to assert a claim under Tennessee's Bad Faith Failure to Pay statute. (Doc. No. 71-5.)

After commencing litigation on October 11, 2011, the Tannenbaums retained meteorologist James Duke, who, in a report dated May 2, 2012, determined that wind speeds at the Property on the morning of May 2, 2010, reached at least between fifty-five and sixty-five miles per hour and that the heaviest rain during the storms that weekend did not fall until after the heaviest winds had come through the area. (Doc. No. 68-1 at 4–5.)

The Tannenbaums also retained chartered property and casualty underwriter Charles Howarth to evaluate FIC's handling of their insurance claim and to determine whether FIC had acted in bad faith. In a report dated July 17, 2012, Mr. Howarth concluded that FIC's conduct in handling the Tannenbaums' claim amounted to bad faith based on: (1) FIC's failure to conduct a reasonable investigation; (2) evidence that the adjusting team may have prematurely concluded that the damage was not covered, which colored the subsequent investigation; and (3) FIC's failure to conclusively disprove the Tannenbaums' theory that wind initiated the landslide. (Doc. No. 56-1 at 4–5.)

FIC subsequently retained a second meteorologist, Donald Burgess, who issued a report on June 29, 2012, determining that, based on the weather information available at the time and the damage observed, winds were not likely the cause of the tree damage that occurred on the Property. (Doc. No. 74-3 at 8–9.) FIC also retained chartered property and casualty underwriter Van E. Hedges, who issued a report on August 28, 2012, regarding FIC's handling of the Tannenbaums' claim. (Doc. No. 56-3.) Mr. Hedges determined that FIC's denial of the claim was reasonable and supported by the claim investigation. (*Id.* at 11.) Mr. Hedges concluded that FIC's handling of the Tannenbaums' claim "met or exceeded the customs, standard [sic] and practices of the insurance industry." (*Id.* at 13.)

B. *Procedural History*

The Tannenbaums filed this suit in Davidson County Circuit Court on October 11, 2011, alleging that FIC wrongly denied their insurance claim and, in doing so, violated their rights under multiple Tennessee laws. (Doc. No. 1-2.) On November 9, 2011, FIC removed the case to this Court (Doc. No. 1) and on March 13, 2013, filed a Motion for Summary Judgment (Doc. No. 54), with a Memorandum in Support (Doc. No. 54-1), a Statement of Undisputed Material Facts (Doc. No. 54-2), and several exhibits, affidavits, and depositions (Doc. Nos. 54-3 to 54-8; 55-1

to 55-4; 56-1 to 56-4; 57-1 to 57-2; 58-1 to 58-12; 59-1 to 59-21; 60-1 to 60-21; 61-1 to 61-17; 62-1 to 62-18; 63-1 to 63-2).  The Tannenbaums filed a Response (Doc. No. 65), with a Response to FIC's statement of facts that contained additional, disputed facts (Doc. No. 66), and several depositions, exhibits, and declarations (Doc. Nos. 67-1 to 67-9; 68–71; 68-1; 68-2; 69-1; 69-2; 70-1; 70-2; 71-1 to 71-5).  FIC filed a Reply (Doc. No. 74) with additional exhibits and depositions (Doc. Nos. 74-1 to 74-3; 75-1; 76-1 to 76-2; 77-1 to 77-2; 78-1 to 78-2; 79-1 to 79-2; 80-1 to 80-3; 81-1 to 81-3), and responded to the Tannenbaums' additional facts (Doc. No. 73).

## II.  LEGAL STANDARD

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must demonstrate that the non-moving party has failed to establish a necessary element of that party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment will be granted if "the evidence is so one-sided that one party must prevail as a matter of law."  *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996).  The movant has the initial burden of informing the district court of the basis of the summary judgment motion and identifying portions of the record which lack a genuine issue of material fact to support the non-movant's case.  *See Celotex*, 477 U.S. at 323.

The non-moving party may not rest solely on the allegations in the complaint, but must delineate specific evidence that shows there is a genuine issue for trial.  *See id.* at 324.  A "mere possibility" of a factual dispute is not sufficient to withstand a properly supported motion for summary judgment.  *Baird v. NHP Mill Creek Apartments*, 94 F. App'x 328, 330–31 (6th Cir. 2004) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).  A dispute about a material fact is genuine if a reasonable fact finder could find for the non-moving party.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A party asserting or denying that a fact is genuinely disputed may support its position by (1) citing to particular parts of materials in the record, (2) showing that the materials cited by the opposing party do not establish the absence or presence of a genuine dispute, or (3) showing that an adverse party cannot produce admissible evidence to support a fact.  Fed. R. Civ. P. 56(c)(1).

All reasonable inferences are to be drawn in favor of the non-moving party and the evidence of the non-movant is to be believed.  *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment."  *Id.*  If the court determines that a reasonable fact finder could not find for the non-moving party, summary judgment must be granted.  *See Lexington-South Elkhorn Water Dist.*, 93 F.3d at 233.

## III.  ANALYSIS

The Tannenbaums allege that, in denying their insurance claim, FIC has (1) violated the Tennessee Bad Faith Refusal to Pay statute ("TBFA"), committed the tort of bad faith for failure to adjust, (2) violated the Tennessee Consumer Protection Act ("TCPA"), (3) breached its contract with the Tannenbaums, and (4) committed the tort of bad faith for failure to adjust.  FIC argues the Tannenbaums have failed to establish a genuine issue of material fact with respect to each of their claims and that it is entitled to judgment as a matter of law.  The Court evaluates each claim in turn.

### A.  *Tennessee Bad Faith Refusal to Pay Statute*

FIC argues the Tannenbaums' TBFA claim should be dismissed because the Tannenbaums have failed to show FIC's handling of their claim was done with intentional indifference or improper motive.  (Doc. No. 54-1 at 20.)

The TBFA provides that when an insurance company refuses to pay a loss within sixty days after a policy holder makes a demand for payment, the insurer becomes liable for the loss and a penalty of up to 25 percent of the loss, if "the refusal to pay the loss was not in good faith, and . . . the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy." Tenn. Code Ann. § 56-7-105(a) (2008).

To succeed on a claim under the TBFA, a plaintiff must prove "(1) that the insurance policy, by its terms, became due and payable; (2) that a formal demand for payment was made; (3) that Plaintiffs waited sixty days after making demand before filing suit; and (4) that [the insurer's] refusal to pay was not in good faith." *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986).

"This statute is penal in nature and must be strictly construed." *Minton v. Tenn. Farmers Mut. Ins. Co.*, 832 S.W.2d 35, 38 (Tenn. Ct. App. 1992). Accordingly,

> [t]he bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. *An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the imposing of the bad faith penalty.*

*Nelms v. Tenn. Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978).

"To sustain a claim for failure to pay in bad faith a plaintiff must demonstrate 'there were no legitimate grounds for disagreement about the coverage of the insurance policy.'" *Fulton Bellows, LLC v. Fed. Ins. Co.*, 662 F. Supp. 2d 976, 996 (E.D. Tenn. 2009) (quoting *Zientek v. State Farm Int'l Servs.*, No. 1:05-CV-326, 2006 WL 925063, at *4 (E.D. Tenn. Apr. 10, 2006)) (citing *Marlin Fin. & Leasing Corp. v. Nationwide Mut. Ins. Co.*, 157 S.W.3d 796, 812–13 (Tenn. Ct. App. 2004)).

Although "an insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss," *Mason v. Tenn. Farmers Mut. Ins. Co.*, 640 S.W.2d 561, 568 (Tenn. Ct. App. 1982), "[w]hether an insurer acted in good faith is generally a fact question for the jury." *Solomon v. Hager*, No. E2000-02586-COA-R3-CV, 2001 WL 1657214, at *12 (Tenn. Ct. App. Dec. 27, 2001) (citing *Mason*, 640 S.W.2d at 567).

Here, the only element of the Tannenbaums' TBFA claim the parties dispute is whether FIC's refusal to pay the claim was made in bad faith. The Tannenbaums allege the following actions taken by FIC amounted to bad faith: (1) Mr. Black's determination that the Tannenbaums' claim was not covered by their policy before inspecting the Property; (2) FIC's unfavorable interpretation of the Policy's coverage, rendered specifically to support its predetermined denial of the claim; (3) FIC's refusal to consider the Tannenbaums' expert reports and opinions, which suggested that the loss was caused by events covered under the Policy; and (4) FIC's failure to alter its decision upon the Tannenbaums' request. (Doc. Nos. 1-2 ¶¶ 41, 42; 65 at 16–17.) In response, FIC argues that it based its decision on a comprehensive and thorough investigation and, therefore, it had substantial legal grounds on which to deny the Tannenbaums' claim. (Doc. No. 54-1 at 14–17.)

The Court finds the Tannenbaums have established a genuine issue of material fact as to whether FIC acted in bad faith, based on their argument that FIC prematurely determined the cause of loss and then focused its investigation towards finding evidence to support its determination. Specifically, the Court finds the following evidence supports the Tannenbaums' argument and creates a genuine factual question as to whether FIC was acting in bad faith:

1. Mrs. Tannenbaum's sworn testimony that Mr. Black told her over the phone—prior to his visiting the Property—that "it sounded like a landslide" and "that's not covered" (Doc. No. 54-7 at 10);

2. A letter of engagement dated May 6, 2010, from Dr. Sykora to Mr. Mortensen agreeing to contract with FIC to investigate the cause of damage stating "[w]e understand that the Tannenbaum residence . . . sustained a loss on May 2, 2010 resulting from a mudflow after heavy rains" (Doc. No. 71-2 at 2);

3. Mr. Mortensen's sworn testimony that at the time of Dr. Sykora's May 6 letter, Mr. Mortensen was the sole source of Dr. Sykora's knowledge about the damage to the Property (Doc. No. 67-5 at 46);

4. Dr. Tannenbaum's sworn testimony that the Tannenbaums pointed out the hole in the ground and the tree with the top snapped off on the hill to Mr. Mortensen, and that he told them those things had "no relevance" (Doc. Nos. 54-8 at 38; 67-9 at 10);

5. The absence from Mr. Mortensen's inspection report or inspection notes following his June 30, 2010, inspection, of any notations regarding the hole in the ground or the snapped tree on the hill (Doc. Nos. 61-8; 62-8;

6. An email dated May 9, 2010, from Dr. Vaughn to Mr. Mortensen stating that based on a preliminary investigation of weather conditions in the Nashville area on May 2, 2010, recorded wind speeds associated with the storm included gusts of up to 65 miles per hour, and that in other counties a tornado with winds estimated at 80 miles per hour and a microburst with peak winds of 70–80 miles per hour had been reported in association with the same line of storms (Doc. No. 71-1 at 1);

7. Dr. Vaughn's weather report prepared for FIC which states "Based on the NWS type of damage done criteria relative to wind speed, 40–72 mph winds are associated with breaking of branches on trees, [and] pushing over of swallow rooted trees" (Doc. No. 59-1 at 4);

8. Mr. Howarth's sworn statement that at the time FIC received Dr. Vaughn's May 9 email, sufficient evidence existed for FIC to approve the Tannenbaums' claim (Doc. No. 69 ¶ 5.b);

9. Mr. Howarth's insurance claim handling report, in which Mr. Howarth determined that FIC's failure to pay the majority of the Tannenbaums' claim was a result of "failure to conduct a reasonable investigation," including ignoring evidence of toppled trees due to strong winds just outside the "flow area" (Doc. No. 69-1 at 4–5);

10. FIC's claim decision awarding the Tannenbaums $58,418.50 for damage to their garage from "a single tree . . . observed leaning on the house" (Doc. No. 61-7 at 5).

Viewing the evidence in the light most favorable to the Tannenbaums and drawing all reasonable inferences in their favor, the Court finds a reasonable jury could find that FIC did not have legitimate grounds to deny the Tannenbaums' claim under the Policy. Accordingly, the Court **DENIES** summary judgment on the TBFA claim.

### B. *Tennessee Consumer Protection Act*

FIC next argues the Tannenbaums' TCPA claim should not survive summary judgment because they have presented no evidence that FIC engaged in deception or misrepresentation in handling their claim. (Doc. No. 54-1 at 21.)

The stated purpose of the TCPA is "[to] protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn. Code Ann. § 47-18-102(2) (2013). "Any person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . declared to be unlawful by [the Act], may bring an action individually to recover actual damages." *Id.* § 47-18-109(a)(1). "The TCPA is complementary to the bad faith penalty statute, and the same conduct may be found to violate both." *Leverette*, 2013 WL 817230, at *20 (citing *Myint*, 970 S.W.2d at 925; *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 820 (Tenn. 2004)).

The TCPA makes illegal and "specifically provides a private right of action for *any* '[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce.'" *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn. 1998) (quoting § 47-18-104(a) and -109(a)(1)). Section 47-18-104(b) provides a list of "unfair or deceptive" acts and practices, including a catch-all provision that states "[e]ngaging in any other act or practice which is deceptive to the

consumer or to any other person" violates the Act.[2]  The Tennessee legislature has explicitly

instructed courts interpreting the TCPA to construe its provisions "consistently with the

interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1)

of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))."  § 47-18-115.  Thus, Tennessee

courts interpreting the TCPA have used federal law to define the key terms in the statute.  *See*

*Tucker*, 180 S.W.3d at 116–17.

"[T]he TCPA is explicitly remedial, and . . . courts are therefore required to construe it

liberally to protect consumers in Tennessee and elsewhere." *Tucker*, 180 S.W.3d at 115.  To

recover under the TCPA, the plaintiff has the burden of proving: "(1) that the defendant engaged

in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the

defendant's conduct caused an 'ascertainable loss of money or property.'" *Tucker v. Sierra*

*Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting § 47-18-109(a)(1)).  If the

plaintiff proves the defendant acted knowingly or willfully, the TCPA permits a treble damages

award.  *Id.* at 115–16; § 47-18-109(a)(3).

The Tennessee Supreme Court has defined a "deceptive act or practice" as "a material

representation, practice or omission likely to mislead a reasonable consumer," and an "unfair

act" as one that "causes or is likely to cause substantial injury to consumers which is not

reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to

consumers or to competition."  *Davis v. McGuigan*, 325 S.W.3d 149, 162 (Tenn. 2010) (internal

quotation marks and citations omitted).  In determining whether the action of an insurance

company violated the TCPA, a court looks for evidence of whether the insurance company (1)

violated or attempted to violate the terms of the policy; (2) deceived the insured about the terms

_____

[2] Section 47-18-104(b) was amended, effective October 1, 2011, to remove the private right of action under the
catch-all provision.  The amendment does not apply to this case, as the cause of action accrued prior to the effective
date of the amendment.  *See* 2011 Tenn. Pub. Acts Ch. 510 § 24; (Doc. No. 1-2 ¶ 14).

of the policy; or (3) otherwise acted unfairly. *Williams v. State Farm Fire & Cas., Co.*, No. 07-02210-JPM/tmp., 2008 WL 2421702, at *5 (W.D. Tenn. June 12, 2008) (citing *Myint*, 970 S.W.2d at 926). While the standard for determining whether a representation is unfair or deceptive under the TCPA is a matter of law, *Tucker*, 180 S.W.3d at 116, "[w]hether a particular act is unfair or deceptive is a question of fact," *Fayne v. Vincent*, 301 S.W.3d 162, 170 (Tenn. 2009).

The Tannenbaums allege the same acts of FIC that support their claim under the TBFA also amount to "unfair or deceptive practices" entitling them to relief under the TCPA: *See supra* Part III.A; (Doc. No. 1-2 ¶¶ 41, 42.) The Tannenbaums allege that, because FIC knowingly and willfully took action in violation of the TCPA, they are entitled to attorney's fees and treble damages. (*Id.* ¶¶ 45–46.)

FIC argues the Tannenbaums' TCPA claim fails as a matter of law because there is no evidence in the record of any deception or misrepresentation by FIC. (Doc. No. 54-1 at 21.) FIC maintains that it was in continuous communication with the Tannenbaums during the course of the claims investigation and that it put the Tannenbaums on notice as early as May 5, 2010, that the "earth movement" exclusion might be applicable to their claim. (*Id.*) FIC states that it relied in good faith on the reports of its experts and was unable to incorporate the Tannenbaums' expert reports into its claim determination because they refused to share their reports or make their experts available to meet with FIC. (*Id.*) FIC states that its experts "definitively determined that the cause of loss was landslide" and, thus, its reliance on their reports was proper. (*Id.* at 21–22.)

The Court finds the Tannenbaums have raised a genuine issue of material fact as to whether FIC acted unfairly by prematurely denying the Tannenbaums' claim and subsequently conducting a pretextual investigation to support its theory. Although FIC asserts that this case

"fits squarely within the recent holding" in *Wilson v. State Farm Fire & Casualty, Co.* 799 F. Supp. 2d 829 (E.D. Tenn. 2011), the Court cannot agree. The court in *Wilson* decided the case on the merits after a two-day bench trial and thus, it was appropriate for the *Wilson* court to weigh evidence and make findings of fact. *Id.* at 831–32. Here, in deciding whether to grant summary judgment the Court is precluded from making findings of fact; instead the Court's analysis ends once it determines a genuine issue of material fact exists.

The Tannenbaums have presented numerous facts in support of their allegations that create a dispute over material facts that a jury could use to determine FIC employed unfair or deceptive practices in denying their claim. Specifically, the Court finds the same evidence the Court listed above (*supra* Part III.A) supports the Tannenbaums' theory of the case; that FIC prematurely determined the cause of loss on their claim and then focused its investigation on finding evidence to support its determination. While declining to determine the veracity of the evidence at this stage, the Court agrees that evidence does exist in the record that could support the Tannenbaums' arguments.

The Court also finds that—contrary to FIC's assertion that the Tannenbaums' own belief in their theory does not make FIC's denial of the claim a violation of the TCPA—the Tannenbaums have gone to great lengths to produce evidence that supports their theory of damages. Namely, the Tannenbaums have employed their own arsenal of experts whom, after researching and inspecting the same evidence as FIC's experts, have come to largely different conclusions. Viewing the evidence in the light most favorable to the Tannenbaums and drawing all reasonable inferences in their favor, the Court finds a reasonable jury could find that FIC's actions in handling the Tannenbaums' claim amounted to unfair or deceptive practices. Thus, the Court **DENIES** summary judgment on the Tannenbaums' claim under the TCPA.

*C. Breach of Contract*

FIC argues that the Tannenbaums' breach of contract claim should also be dismissed because the majority of damage to the Property was caused by landslides and mudflows, which are specifically excluded from coverage under the Policy.  In the alternative, FIC argues that language in the Policy amounts to an anti-concurrent causation clause, thereby precluding coverage for any loss caused by an excluded cause, even if a covered cause also contributed to the loss.

In Tennessee, courts interpreting insurance policies apply "the same rules of construction as are applicable to other types of contracts." *Marlin Fin. & Leasing Corp.*, 157 S.W.3d at 808–09.  A contract should be interpreted, when possible, "according to its plain terms, considering the entire contract when determining the meaning of any or all of its parts." *Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001) (citations omitted).  In effect, "[a] Court must read an insurance contract as a layperson would read it." *Id.*

It is well-settled in Tennessee that "exceptions, exclusions and limitations," *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991), and "uncertainties or ambiguities in an insurance policy 'must be construed strongly against the insurer and in favor of the insured,'" *Marlin Fin. & Leasing Corp.*, 157 S.W.3d at 809 (quoting *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 366 (Tenn. 1973)).  Further, "[w]here an all-risk insurance policy is involved, the insurer must show that an exclusion applies in order to avoid liability, and exclusionary clauses are to be strictly construed against the insurer." *Davidson Hotel Co.*, 136 F. Supp. 2d at 905 (citing *Farmers Bank & Trust Co. of Winchester v. Transamerica Ins. Co.*, 674 F.2d 548, 551 (6th Cir. 1982); *Mid-South Title Ins. Corp. v. Resolution Trust Corp.*, 840 F. Supp. 522, 526 (W.D. Tenn. 1993)).

The Tannenbaums allege the **structural** damage to the Property was caused solely by wind associated with severe thunderstorms and that the impact of the trees damaged, among other things, the roof over their garage and caused a crack in a shear wall at the rear of the main house, which compromised the entire structure's stability. (*Id.* ¶¶ 8–16.) Because wind is a covered peril under the Policy, the Tannenbaums argue FIC's failure to pay the structural damage portion of their claim amounted to a breach of their insurance contract. (*Id.* ¶¶ 31–35.) They note that even FIC's experts do not opine that a landslide caused the structural damage to the main house. (*Id.* at 10–11.)

In addition, the Tannenbaums argue that, although FIC argues that wind could not have been the cause of damage, its conceded coverage for some damage caused by wind. (*Id.* at 11–12.) The Tannenbaums argue the central issue to the breach of contract claim is: what force of nature caused the damage? Therefore they conclude that, because this issue is a question of fact, the breach of contract claim is not ripe for determination on summary judgment. (*Id.* at 10.)

FIC argues that the Tannenbaums' losses are not covered by the Policy because the majority of the damage incurred on the Property was the result of causes excluded from coverage under the "earth movement" exclusion. (Doc. No. 54-1 at 25, 27–28.) In the alternative, FIC argues that even if earth movement was only one of multiple causes of damage to the Property, the Policy contains language that amounts to an anti-concurrent causation clause ("ACC"), thereby excluding any loss "that is contributed to, made worse by, or in any way results from" earth movements, regardless of whether other covered causes were also responsible for the damage. (*Id.* at 25 (quoting Doc. No. 55-4 at 18).)

While contractual interpretation is an issue of law to be determined by the Court, *Davidson Hotel Co.*, 136 F. Supp. 2d at 905, the Court finds that the issue of whether language in

the Policy is to be construed as an ACC is not ripe for determination at the summary judgment stage in this case. Regardless the Court's decision about the existence of an ACC in the Policy, an issue of fact remains as to whether the structural damage to the Property was caused by wind, earth movement, or a combination of the two. Further, should a jury decide the loss was caused by a single peril—be it earth movement or wind—the relevance of the Court's ACC determination will have no bearing on the judgment in this case. Thus, as a genuine dispute of material fact exists, the Court **DENIES** summary judgment as to the breach of contract claim.

### D. Bad Faith Failure to Adjust

FIC argues that the Tannenbaums' failure to adjust claim is wholly subsumed by their TBFA and TCPA claims and, thus, under Tennessee law cannot be treated as a separate cause of action. (Doc. No. 54-1 at 22.)

Tennessee courts have long held that Tennessee does not recognize a common law tort of bad faith for actions between an insured and its insurer for actions covered by the TBFA. *Leverette v. Tenn. Farmers Mut. Ins. Co.*, No. M2011-00264-COA-R3-CV, 2013 WL 817230, at *17 (Tenn. Ct. App. Mar. 4, 2013). Instead, "Tenn. Code Ann. § 56-7-105, provides the exclusive remedy for an insurer's failure to pay a claim in bad faith." *Leverette*, 2013 WL 817230, at *17–18 (citing *Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615, 619–21 (Tenn. Ct. App. 1986) (refusing to recognize the existence of the tort of bad faith between an insured and an insurer where statutory relief was available)). "In the 27 years since *Chandler* was decided, neither the Tennessee Court of Appeals 'nor the Tennessee Supreme Court has overruled or even questioned the continuing validity of *Chandler*', nor has either court 'explicitly recognized a tort based upon an insurer's bad faith in situations covered by the bad faith penalty statute.'" *Westfield Ins. Co. v. RLP Partners, LLC*, No. 3:13-00106, 2013 WL 2383608, at *2 (M.D. Tenn.

May 30, 2013) (quoting *Leverette*, 2013 WL 817230, at * 18).  *See also Rice v. Van Wagoner Cos.*, 738 F. Supp. 252, 253 (M.D. Tenn. 1990) ("To the extent that the plaintiffs may be claiming these damages under a [bad faith] tort theory, the court has no difficulty dismissing the claim. . . . [N]o tort of bad faith is available."); *Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 590 F. Supp. 2d 970, 972 (M.D. Tenn. 2008) ("Tennessee does not recognize a general common law tort for bad faith by an insurer against an insured; the exclusive remedy . . . is statutory.").

FIC argues the Tannenbaums' failure to adjust claim is subsumed by other claims because it relies on the same factual basis the Tannenbaums allege in support for their TCPA and TBFA claims.  (Doc. No. 54-1 at 24.)  The Tannenbaums appear to concede that their failure to adjust claim is covered under the TBFA, as their Response treats both claims together under the statute.  (Doc. No. 65 at 15–16.)

The Court agrees.  The Tannenbaums' claim for failure to adjust stems from their assertion that the first FIC claims adjuster to handle their claim, Mr. Black, determined the cause of loss for the weather-related damage to their home before viewing the property.  (Doc. No. 1-2 ¶ 37.)  They assert that Mr. Black could not properly determine the cause of damage without viewing their home and, thus, his denial was premature and constituted failure to properly adjust the claim.  (*Id.* ¶¶ 37, 38.)

The Court finds that, as a matter of law, the Tannenbaums' claim for failure to adjust is not recognized at common law in Tennessee.  As the overwhelming precedent makes clear, an insured's claim against his insurer for bad faith failure to adjust is exclusively actionable under the TBFA.  Accordingly, the Court finds that, with respect to the Tannenbaums' failure to adjust claim, they have failed to state a claim upon which relief can be granted, and FIC is entitled to

judgment as a matter of law.  The Court **GRANTS** summary judgment in favor of FIC and

**DISMISSES** the Tannenbaums' claim for bad faith failure to adjust.

**IV.**     **CONCLUSION**

For the foregoing reasons, FIC's Motion for Summary Judgment (Doc. No. 54) is

**GRANTED** to the extent that the Tannenbaums' claim for failure to adjust is **DISMISSED** and

**DENIED** with respect to all other claims.

It is so ORDERED.

Entered this _____24th_____ day of June, 2013.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT